***NOT FOR PUBLICATION***

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOHN MCKENNA,<br><br>      Plaintiff,<br><br>v.<br><br>VERINT AMERICAS INC.,<br>DAVID ZEMBER, JACKIE HUDSON,<br>TIMOTHY WILKIE, JOHAN DE JONG,<br>CASEY GEORGE, BRAD RAMSEY,<br>ABC CORPORATIONS 1-5 (fictious names<br>describing presently unidentified business<br>entities); and JOHN DOES 1-5 (fictious names<br>describing presently unidentified individuals),<br><br>      Defendants. | Civil Action No. 22-02370 (FLW)<br><br>OPINION |

**WOLFSON, Chief Judge:**

      Presently before this Court is Plaintiff John McKenna's ("Plaintiff") motion to remand this employment action to state court. Plaintiff submits that because one of the named defendants, Timothy Wilkie ("Wilkie"), is a citizen of New Jersey, removal violated the forum defendant rule. Further, Plaintiff argues that since his complaint asserts a "colorable claim" against Wilkie, defendants, Verint Americas Inc. ("Verint"), David Zember ("Zember"), Jackie Hudson ("Hudson"), Johan De Jong ("De Jong"), Casey George ("George") and Brad Ramsey ("Ramsey") ("Defendants"), fail to meet the "heavy burden" of demonstrating that Wilkie was fraudulently joined. Plaintiff's motion also requests attorney's fees.

      For the following reasons, I find that Wilkie was fraudulently joined, and therefore, removal to this Court was proper. Plaintiff's motion to remand is **DENIED**.

1

I. **FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

The relevant facts are derived from Plaintiff's Initial Complaint to the Superior Court of New Jersey ("Compl."), and taken as true.

Plaintiff resides in Bayville, New Jersey. Compl. ¶ 1. At all relevant times, Plaintiff was employed by Verint as Vice President of Business Development. *Id.* At Verint, Plaintiff specialized in increasing productivity and efficiency for retail banks that were clients of Verint. *Id.* at ¶ 13. Verint is a global corporation based in Melville, New York. *Id.* at ¶ 2. Wilkie, a New Jersey citizen, was at all relevant times the Senior Account Executive at Verint. *Id.* at ¶ 5. There is no dispute that Wilkie was not Plaintiff's supervisor or otherwise managed Plaintiff's employment in any way. Plaintiff alleges that he was wrongfully terminated for disclosing, and objecting to, various acts of fraud that were being committed by Defendants against both Verint and its clients. ECF No. 1, Compl. ¶ 93. As to Wilkie, the Complaint alleges that Wilkie engaged in a fraudulent act and retaliated against Plaintiff after Plaintiff prevented Wilkie from carrying out the fraud. *Id.* at ¶ 86.

In or around 2019, Plaintiff and Wilkie agreed to work together on an opportunity to provide sales and services to Citibank. *Id.* at ¶ 23. Due to this agreement, Plaintiff informed his manager that the prospective opportunity should be placed in Verint's "exception list[,]" which would allow Wilkie to earn commission based on the work performed. *Id.* at ¶ 24. However, Plaintiff alleges that it "became clear that Plaintiff was performing all of the substantive work. . ., while Defendant Wilkie failed to participate." *Id.* at ¶ 25. According to Plaintiff, Wilkie would occasionally ask for updates, and Plaintiff believed that Wilkie used these updates to falsely represent that he was a part of the project and to submit reports into Verint's Salesforce accounting software. *Id.* at ¶ 26. Plaintiff alleges Wilkie falsely represented his participation in the project

because, in the event of a sale of the Citibank project, Wilkie could claim significant commissions. *Id.* at ¶ 27. As a result, Plaintiff believed that Wilkie was attempting to defraud Verint and its shareholders, and that Wilkie's conduct allegedly violated federal and state banking laws. *Id.* at ¶ 28. Subsequently, Plaintiff reported Wilkie to his supervisors within Verint. *Id.* at ¶¶ 29-30. Shortly thereafter, Plaintiff alleges that Wilkie began to "retaliate" against Plaintiff for objecting to the fraud. *Id.* at ¶ 43. Specifically, Plaintiff alleges that Wilkie committed the following acts of retaliation against Plaintiff, which culminated in Plaintiff's wrongful termination:

> [1] Defendant Wilkie attempted to dissuade Plaintiff from reporting the fraud and/or asked him to look the other way;
> [2] Plaintiff received a number of angry emails and phone calls from Defendant Wilkie;
> [3] Defendant Wilkie wrote to Plaintiff that the prospective Citibank sale "will make or break my year[;]"
> [4] Defendant Wilkie sought to punish Plaintiff for his interference with the fraudulent scheme he was committing against Defendant Verint and its shareholders.

Compl. ¶¶ 35-37, 43-47.

In 2020, the sales opportunity with Citibank was still ongoing. *Id.* at ¶ 31. During this time, Verint investigated Wilkie after Plaintiff submitted a statement that Wilkie "has not participated" in the prospective Citibank project. (Pl. Mem. at 7.) As a result of the investigation, the prospective opportunity was removed from Verint's "exception list." Compl. ¶ 32. Thus, in the event of a sale, Wilkie would not receive a commission. *Id.* Subsequently, Plaintiff alleges that Wilkie complained to his supervisor, Zember[1], who, allegedly, was also set to lose money from the delisting of the Citibank project from the "exception list." *Id.* at ¶ 33.

---

[1] Defendant Zember is an individual residing in Georgia. At all times relevant hereto, Zember was employed by Verint as an Area Vice President of Sales. Compl. ¶ 3.

In 2021, Zember became Plaintiff's direct supervisor. *Id.* at ¶ 44. Plaintiff claims that he was alarmed by the prospect of Zember's supervision, because Plaintiff feared retaliation from Zember due to Plaintiff's reporting of Wilkie's illicit activity. *Id.* at ¶ 45. In Plaintiff's first one-on-one meeting with Zember, Plaintiff asked if there would be a conflict of interest due to Plaintiff's experience with Wilkie on the Citibank project, and Zember allegedly promised there would not be. *Id.* at ¶ 47.

In October 2021, Plaintiff reported Zember to Hudson[2] (Zember's supervisor) for allegedly encouraging Plaintiff to falsify expense reports. *Id.* at ¶ 52. Plaintiff alleges that, had he filed that false report, he would have been terminated. *Id.* at ¶ 54. Plaintiff believed Zember was attempting to sabotage his employment with Verint in retaliation for Plaintiff's objections to Wilkie receiving a commission on the Citibank opportunity. *Id.*

In November 2021, Plaintiff expected to close on a deal with Huntington Bank when, according to Plaintiff, Zember sought to "wet [his] beak[]" in the sale made solely by Plaintiff. *Id.* at ¶¶ 57, 60. Allegedly, "Zember and Ramsey[3] determined that they could 'get away with' selling XM Solutions product[4] to Huntington Bank by including it in the deal for 'free,' but internally, Defendants would falsely report to Defendant Verint that the sale of XM Solutions earned Defendant Verint approximately $60,000.00 by subtracting this sum from the amount that Plaintiff was [already] set to sell." *Id.* at ¶ 59. According to Plaintiff, he believed Zember placed him in a position to misrepresent to Mr. Carter (Plaintiff's client from Huntington Bank) about the sudden

---

[2] Defendant Hudson is an individual residing in the District of Columbia. At all times relevant hereto, Hudson was employed by Verint as Vice President and General Manager. Compl. ¶ 4.
[3] Defendant Ramsey is an individual residing in Georgia. At all times relevant hereto, Ramsey was employed by Verint as a Vice President of Sales. Compl. ¶ 8.
[4] "A product that Defendant Ramsey was in charge of selling." Compl. ¶ 58.

additional product, and take a "haircut" in the amount earned from the initial deal. *Id.* at ¶ 61. Thus, Plaintiff disclosed the additional product to Mr. Carter, who responded that Huntington Bank did not want to purchase the XM solutions. *Id.* at ¶ 62. Plaintiff then spoke to Hudson, who stated that "this is not how [Defendant] Verint conducts business[,]" and that the scheme was "wrong," and "Verint could not do this." *Id.* at ¶ 65. Ultimately, Plaintiff refused to participate in this allegedly scheme against his client, and instructed Mr. Carter on how to avoid receipt of the XM Solutions product. *Id.* at ¶ 68. According to Plaintiff, "Zember. . . [was] furious with Plaintiff when [he]. . . learned that. . . [his product] was not included in the Huntington Bank Deal." *Id.* at ¶ 70.

Subsequently, on or about February 7, 2022, Plaintiff received an email and call from Johan De Jong[5] pursuant to an internal "investigation," asking Plaintiff questions about a book[6] he wrote eight years before. *Id.* at ¶ 74.

On or about February 10, 2022, Zember and De Jong invited Plaintiff to a Zoom meeting. *Id.* at ¶ 75. At the meeting, Zember allegedly stated that Plaintiff was fired, and promptly left the meeting. *Id.* As alleged, De Jong explained that Plaintiff was fired because Verint "[was] offended" by his book. *Id.* Plaintiff avers that the given reason was pretextual in order to terminate Plaintiff. *Id.* at ¶ 76. Specifically, Plaintiff alleges that:

> "[5] Defendant Zember became Plaintiff's direct supervisor and worked with Defendant Wilkie to come up with pretextual reasons to terminate Plaintiff's employment with Defendant Verint – therefore, Defendant Wilkie conspired and aided/abetted Defendant Verint and Individual Defendants to wrongfully terminate Plaintiff for his objections, disclosures, and refusal to participate in the fraudulent scheme that Defendant Wilkie was conducting against Defendant Verint and its shareholders."

---

[5]   Defendant De Jong is an individual residing in Georgia. At all times relevant hereto, De Jong was employed by Verint as a Senior Vice President and General Manager. Compl. ¶ 6.

[6]   While Plaintiff was in Pittsburgh with one prospective client and a business partner of Verint in October 2021, he discussed a satire comedy book that Plaintiff wrote under an anonymous pen name. Compl. ¶ 72. The book offered a "humorous perspective" on marital infidelity. *Id.* at ¶ 73.

Compl. ¶¶ 35-37, 43-47.

Initially, Plaintiff filed his Complaint in the New Jersey Superior Court on March 23, 2022, asserting claims pursuant to New Jersey Conscientious Employee Protection Act ("CEPA"), N.J.S.A. 34:19-1, *et seq*., and New Jersey Wage Payment Law, N.J.S.A 34:11-4.1, *et seq*. *Id.* at ¶¶ 94–109. Particular to the CEPA claim, which is the only claim asserted against Wilkie, Plaintiff alleges that Wilkie is liable for aiding and abetting the illegal termination of Plaintiff's employment. Compl. ¶¶ 94–103. On April 25, 2022, Defendants removed this matter to this Court. In their Notice of Removal, Defendants set forth that the Court has original jurisdiction over this matter based on diversity of citizenship, because the sole New Jersey resident, Wilkie, is fraudulently joined.

## II. LEGAL STANDARD

### A. Removal

"A defendant may remove a civil action filed to federal court if the federal court would have original jurisdiction to hear the matter in the first instance." *Farparan v. Autozoners, LLC*, No. 19-21464, 2020 WL 4596927, at *2 (D.N.J. Aug. 11, 2020) (quoting 28 U.S.C. §1441(a)). Where, as here, "federal jurisdiction is premised only on diversity of the parties, the forum defendant rule applies." *Encompass Ins. Co. v. Stone Mansion Rest. Inc.*, 902 F.3d 147, 152 (3d Cir. 2018). This rule provides that a "civil action otherwise removable solely on the basis of [diversity jurisdiction] may not be removed if any of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought." *Id.* (quoting 28 U.S.C. § 1441(b)(2)). If an action has already been removed to a federal court, "a district court may remand the matter to state court if the removal was procedurally defective or if subject matter jurisdiction was lacking." *Farparan*, 2020 WL 4596927 at *2 (quoting 28 U.S.C. § 1447(c)).

Notably, the party "who urges jurisdiction on a federal court bears the burden of proving that jurisdiction exists[.]" *Boyer v. Snap-on Tools Corp.*, 913 F.2d 108, 111 (3d Cir. 1990); *see In re Briscoe*, 448 F.3d 201, 217 (3d Cir. 2006) ("removal statutes are to be strictly construed against removal and all doubts should be resolved in favor of remand"); *see also Mahmoud v. Canon Sols. Am., Inc.*, No. 21-11935, 2021 WL 6197422, at *2 (D.N.J. Dec. 22, 2021) ("A case must be remanded if, at any time before final judgment, the district court discovers that it lacks subject matter jurisdiction.").

### B. Fraudulent Joinder

"Where removal is premised on diversity jurisdiction," as it is here, the removing party "may only avoid remand by demonstrating that the defendant sued in his [or her] home state was fraudulently joined." *Ware v. CIBA Specialty Chems. Corp.*, No. 04-1645, 2004 WL 1743938, at *2 (D.N.J. Aug. 4, 2004) (citation omitted). Joinder is considered fraudulent "where there is no reasonable basis in fact or colorable ground supporting the claim against the joined defendant, or no real intention in good faith to prosecute the action against the defendants or seek a joint judgment." *Id.* (quoting *Batoff v. State Farm Ins. Co.*, 977 F.2d 848, 851 (3d Cir. 1992)). In that connection, "if there is even a possibility that a state court would find that the complaint states a cause of action against any one of the resident defendants, the federal court must find that joinder was proper and remand the case to state court." *Batoff*, 977 F.2d at 851 (quoting *Boyer*, 913 F.2d at 111). However, where a non-diverse party has been fraudulently joined, remand should be denied. *Curtiss Wright Corp. v. CNA Fin. Corp.*, 2012 U.S. Dist. LEXIS 42716, at *4 (D.N.J. Mar. 28, 2012).

> The purpose of the fraudulent joinder doctrine is to weed out defendants who have been added solely to defeat federal jurisdiction and against whom non-colorable claims have been asserted. The Court may not simply accept the addition of a defendant on faith that he or she was added on the basis of his or her involvement

> in unlawful activity, if the facts in the Amended Complaint do not colorably support such an assertion.

*Sussman v. Capital One, N.A.*, No. 13-6483, 2015 WL 164095, at *6 (D.N.J. Jan. 13, 2015).

Therefore, when assessing fraudulent joinder, "it is not a district court's role . . . to scrutinize the merits of a claim," or even to determine "whether plaintiff's claims are 'plausible' under *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), or Rule12(b)(6)[.]" *McBurnie v. CRC Ins. Servs., Inc.*, No. 19-20018, 2020 WL 1329917, at *4 (D.N.J. Mar. 23, 2020); *Abbedutto v. Johnson & Johnson*, No. 17-5724, 2019 WL 3245105, at *2 (D.N.J. July 19, 2019) (citing *Briscoe*, 448 F.3d at 218; *Batoff*, 977 F.2d at 852); *see Briscoe*, 448 F.3d at 219 (noting that an inquiry into the legal merits of a claim in a fraudulent joinder determination would be "inappropriate") (citation omitted); *see also McBurnie*, 2020 WL 1329917 at *4 ("Plaintiff is not required to prove his case against [the joined defendant] in order to overcome the 'fraudulent joinder' accusation.") (citation omitted). Rather, the district court's inquiry merely "focuses on whether [plaintiff's claims] are more than 'frivolous.'" *Abbedutto*, 2019 WL 3245105 at *2 (citations omitted); *see Annen v. Morgan Technical Ceramics*, No. 18-11197, 2019 WL 325542, at *5 (D.N.J. Jan. 24, 2019) ("The fraudulent joinder analysis looks for a 'colorable' claim and does not go so far as to determine whether the complaint states a claim under a motion to dismiss standard.") (citation omitted); *see also Batoff*, 977 F.2d at 852 ("[I]t is possible that [a] party is not fraudulently joined, but that the claim against that party ultimately is dismissed for failure to state a claim upon which relief may be granted.").

Importantly, "the removing party carries a heavy burden of persuasion" in proving fraudulent joinder. *Briscoe*, 448 F.3d at 217. When determining whether a defendant has been fraudulently joined, the court must consider "the plaintiff's complaint at the time the petition for removal was filed" and "must assume as true all factual allegations of the complaint." *Id.* (quoting

8

*Batoff*, 977 F.2d at 851–52). Moreover, when determining if joinder is fraudulent, the court may properly look outside the four corners of the pleadings to "identify indicia of fraudulent joinder." *Briscoe*, 448 F.3d at *219. Indeed, "*Briscoe* stated that besides considering the information in plaintiff's complaint, district courts may engage in limited considerations of reliable evidence proffered by removing defendants to determine the insubstantial and frivolous nature of the claims against non-diverse defendants." *Williamson v. Daiichi Sankyo, Inc.*, No. 15-2606, 2017 WL 435301, at *2 (D.N.J. Jan. 31, 2017).

### III. DISCUSSION

#### A. Defendant Wilkie was Fraudulently Joined.

Plaintiff argues that, because Wilkie is a New Jersey resident, this matter was improperly removed from the state court on the basis of diversity jurisdiction as the removal violates the forum defendant rule. Defendants concede that Wilkie is a New Jersey resident, but contend that Plaintiff has failed to assert a colorable claim against Wilkie, and as such, he was fraudulently joined. Specifically, as it relates to Plaintiff's CEPA claim, Defendants maintain that Plaintiff's allegations against Wilkie "do not point to any such unlawful retaliatory conduct by Defendant Wilkie because Wilkie engaged in no retaliatory act." (Def's. Reply Br. 8). I agree. Plaintiff has not alleged a colorable claim against Wilkie.

> CEPA bars any retaliatory action against an employee because that employee:
>
> Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes: (1) is in violation of a law, or a rule or regulation promulgated pursuant to law including any violations involving. . . improper quality of patient care; (2) is fraudulent or criminal; or (3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.

N.J.S.A. 34:19-3. *See McCullough v. City of Atlantic City*, 137 F. Supp. 2d 557, 572–73 (D.N.J. 2001). Section 34:19-2(e) defines "retaliatory action" as the "discharge, suspension or demotion

of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment." Moreover, "employer" is defined an "individual, . . . corporation or any person or group of persons acting directly or indirectly on behalf of or in the interest of an employer with the employer's consent[.]" N.J.S.A. 34:19-2(a); *see Palladino ex rel. U.S. v. VNA of Southern New Jersey, Inc.*, 68 F. Supp. 2d 455, 471–72 (D.N.J. 1999) (noting that New Jersey Supreme Court determined that "with employer's consent" reflects normal agency respondent superior principles such that both employers and employers' agents could be held liable for retaliation) (citing *Abbamont v. Piscataway Tp. Bd. of Educ.*, 138 N.J. 405, 414 (1994)). Therefore, CEPA liability "may attach to individuals who perform retaliatory acts" within the scope of their employment. *Southward v. Elizabeth Bd. of Educ.*, No. 15-3699, 2017 WL 111924, at *10 (D.N.J. Jan. 11, 2017). Importantly, relevant here, individual liability is not reserved solely for direct supervisors or individuals who take direct retaliatory action; CEPA liability can also be imposed on individuals, such as indirect supervisors and co-workers who allegedly participated in the retaliatory scheme. *Bowen v. Parking Auth. Of City of Camden*, No. 00-5765, 2003 WL 22145814, at *22–23 (D.N.J. Sept. 18, 2003). However, individual liability requires personal involvement of each individual defendant, and thus CEPA, "will not impose liability on any employee. . . unless the plaintiff [alleges] that the [individual] defendant took [some] adverse action against him because of his whistleblowing." *Curley v. Mercury Insurance Services, LLC, et al*, 2022 U.S. Dist. LEXIS 25426, at *17–18 (D.N.J. Feb. 10, 2022) (citing *Bowen*, 2003 WL 22145814, at *23).

In *Curley*, a case upon which both parties rely on this motion, this Court found that defendant Haner, who was a division manager responsible for the overall operational supervision at defendant-company, was not fraudulently joined because the plaintiff alleged colorable legal claims against her. *Id.* at *1. There, I explained that, "[d]uring the relevant period, [p]laintiff

10

confronted Haner on numerous occasions about [Haner's] alleged wrongdoings and reported Haner's activities in great detail to his immediate supervisor." *Id.* at *9. Further, the plaintiff reported Haner's activities to the highest levels of the company's management hierarchy, resulting in Haner's admonishment by the company's audit team. *Id.* at *20. Moreover, and most importantly, "Haner was in a position of authority over Plaintiff." *Id.* at *6. ("Although an organizational chart would not place Haner as Plaintiff's direct supervisor, Plaintiff alleges that Haner was nevertheless charged with the overall operation supervision of the Bridgewater Office where Plaintiff worked."). *Id.* Thus, I found that Haner had superior authority over Plaintiff, such that it would not be a "legal [or factual] impossibility" that Haner could have had a role in the decision to terminate Plaintiff. *Id.* (citing *McBurnie*, 2020 WL 1329917 at *4).

However, the instant matter is distinguishable from *Curley*. Here, Wilkie's alleged retaliatory acts are implausible, because he was not in any position of authority over Plaintiff. While "CEPA liability can be imposed on individuals, such as indirect supervisors and co-workers who allegedly participated in the retaliatory scheme[,]" Wilkie has not been alleged to be personally involved in any aspect of Plaintiff's employment, let alone his termination. *Id.* at *15–16. Indeed, there is no liability under CEPA for any employee or supervisor unless the plaintiff can show that the individual defendant took an adverse employment action against the plaintiff because of whistleblowing conduct. *Bowen*, 2003 WL 22145814 at *23. ("[P]laintiffs will rarely sue an attorney or a co-employee under CEPA because they will rarely be able to prove that the attorney or co-employee took an adverse employment action against a plaintiff"). Here, first and foremost, Wilkie had no management responsibility over Plaintiff. While Wilkie had allegedly complained to Zember about the removal of Wilkie's name from the "exceptions list," this act is insufficient to infer that Wilkie somehow took an adverse employment action against Plaintiff. *See*

11

*Hitesman v. Bridgeway, Inc.*, 93 A.3d 306, 319 (N.J. 2014) (finding that "routine dispute[s] in the workplace" are insufficient to state a viable CEPA claim). Thus, as the allegations stand, because Wilkie did not hold any position of authority over Plaintiff, and there are no express allegations that Wilkie was involved in Plaintiff's termination, I am not satisfied that the complaint asserted any colorable claim against Wilkie for aiding and abetting under CEPA.

Furthermore, Plaintiff has not asserted a colorable theory regarding Wilkie's involvement in the alleged retaliation. To state a claim for individual liability under CEPA, a plaintiff must "aver factual allegations that, if accepted as true, could establish how each individual defendant was personally liable for a CEPA violation," including by showing "that each defendant took a retaliatory adverse employment action against [plaintiff] that was causally linked with [plaintiff]'s alleged disclosure of 'unethical, unlawful, illegal, fraudulent, and corrupt activity.'" *Brennan v. Palmieri*, 2008 U.S. Dist. LEXIS 102152, at *26 (D.N.J. Dec. 11, 2008). Here, during the relevant period, as alleged, a single dispute with Wilkie arose once Plaintiff reported Wilkie's behavior on the Citibank project. As a result of that dispute, Plaintiff alleges that "[he] received a number of angry emails and phone calls from both Defendants Wilkie and Zember[,]" that "Defendant Wilkie. . . attempted to dissuade Plaintiff from reporting the fraud[,]" and "Defendant Wilkie wrote to Plaintiff that the Citibank sale will 'make or break my year.'" Compl. ¶¶ 36-37. In that regard, other than complaints and unpleasantries from Wilkie, Plaintiff fails to allege any specific claims of unlawful retaliation on the part of Wilkie. Plaintiff merely alleges, in a conclusory manner, that Zember conspired with Wilkie to become Plaintiff's direct supervisor, and created pretextual reasons to terminate Plaintiff's employment. However, Plaintiff has not supported these conclusory claims with allegations of any specific measures that Wilkie aided and abetted Plaintiff's termination. *See Foscue v. Zimmer, Inc.*, 2013 U.S. Dist. LEXIS 126278, at *37 (D.N.J.

Sep. 3, 2013) (individual defendant was fraudulently joined where "[plaintiff] did not point to any specific actions taken by [individual] and that Plaintiff's general allegations as set forth in the Amended Complaint are not sufficient to keep [individual] in this case with individual liability"). The conclusory nature of Plaintiff's allegations is the clearest indication that Plaintiff has no intention to prosecute claims against Wilkie.

For purposes of determining diversity, the Supreme Court has emphasized that only parties with whom the plaintiff has a "real and substantial" controversy may be considered. *Navarro Sav. Ass'n v. Lee*, 446 U.S. 458, 460 (1980). Thus, "a federal court must disregard nominal or formal parties and rest jurisdiction only upon the citizenship of real parties to the controversy." *Id.* at *461. Accordingly, because I find that Plaintiff fails to assert a colorable CEPA claim against Wilkie, Wilkie has been fraudulently joined in this action such that removal, based on diversity, was proper.

### B. Attorney's Fees

Plaintiff's request for an award of attorney's fees in connection with his motion to remand is denied because Defendants had an objectively reasonable basis for removal, specifically, that there is no colorable claim against Wilkie. Absent unusual circumstances, "courts may award attorney's fees only where the removing party lacked an objectively reasonable basis for seeking removal . . . . Conversely, when an objectively reasonable basis exists, fees should be denied." *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 141 (2005); *see Parrish v. Arc of Morris Cty., LLC*, 193 F. Supp. 3d 425, 435 (D.N.J. 2016) ("While bad faith is not required for an award of attorney's fees, a good faith basis for seeking removal prohibits such an award."). Here, Defendants have shown a good faith basis for seeking removal because, absent Wilkie, complete diversity exists among the remaining parties in this matter.

## IV. CONCLUSION

Because Plaintiff has not alleged a colorable CEPA claim against Wilkie, Defendants' removal was proper. Plaintiff's motion to remand is **DENIED**. Moreover, Plaintiff's request for attorney's fees is **DENIED**. An appropriate Order will follow.

Date:   August 9, 2022                                                  /s/ Freda L. Wolfson
                                                                        Freda L. Wolfson
                                                                        U.S. Chief District Judge