UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| **JOHN MCKENNA,** | Case No. 22–cv–02370–ESK–EAP |
| Plaintiff, | |
| v. | OPINION |
| **VERINT AMERICAS INC.,** *et al.*, | |
| Defendants. | |

**KIEL, U.S.D.J.**

 **THIS MATTER** is before the Court on a motion for summary judgment (Motion) by defendants Verint Americas Inc., David Zember, Jackie Hudson, Timothy Wilkie, Johan DeJong, Casey George, and Brad Ramsey (collectively, Defendants) (ECF No. 58). Defendants filed a brief in (ECF No. 58–5 (Mov. Br.)) and a statement of undisputed material facts (ECF No. 58–4 (Def. SOMF)) in support of the Motion. Plaintiff John McKenna filed a brief in support of his opposition (ECF No. 59–2 (Opp'n. Br.)), and a counter statement of material facts (ECF No. 59–1 (Pl. Counter SOMF)) in opposition to the Motion. Defendants filed a brief (ECF No. 60–2) and a reply statement of material facts (ECF No. 60–1 (Reply SOMF)) in response to plaintiff's opposition.[1]

 For the following reasons, Defendants' Motion will be **GRANTED**.

---

[1] Plaintiff did not file a statement of material facts with his opposition. To the extent plaintiff attempts to do so in his "statement of facts" section in his opposition brief (Opp'n Br. pp. 8–34), that is not permitted by L.Civ.R. 56.1, which states that "[e]ach statement of material facts shall be a separate document (not a part of a brief)[.]"

## I. THE PARTIES

Plaintiff was employed at Verint as Vice President of Business Development.  (ECF No. 1 (Compl.) ¶1.)  Verint was a global corporation in Melville, New York that employed the individual defendants.  (*Id.* ¶2.)  Zember was employed as Area Vice President of Sales.  (*Id.* ¶3.)  Hudson was employed as Vice President and General Manager.  (*Id.* ¶4.)  Wilkie was employed as a Senior Account Executive.  (*Id.* ¶5.)  DeJong was employed as Vice President of Human Resources.  (*Id.* ¶6.)  George was employed as Senior Vice President and General Manager.  (*Id.* ¶7.)  Ramsey was employed as Vice President of Sales.  (*Id.* ¶8.)

## II. FACTUAL BACKGROUND

Before working for Verint, plaintiff was employed at Kiran Analytics (Kiran) as Vice President of Business Development and he was tasked with selling workforce optimization software tools and services to financial institutions.  (Def. SOMF ¶10; Pl. Counter SOMF ¶10.)  In 2018, Verint acquired Kiran, after which plaintiff continued in the same position with the same responsibilities.  (Def. SOMF ¶11; Pl. Counter SOMF ¶11.)

Plaintiff was terminated on June 10, 2022.  (ECF No. 59–9 p.12.)  The reasons for the termination were outlined in a document titled "Internal Investigation," dated February 2022.  (*Id.* at pp.6–12.)  The Internal Investigation noted that concerns arose as to plaintiff in October 2021 when plaintiff went to a business dinner with three clients from three separate companies.  (*Id.* at p.8.)  After the dinner, plaintiff sent two of the clients a copy of a purportedly sexually explicit book that plaintiff wrote titled "It Takes Stugotz: Do you have the []'Balls'[] to Jeopardize Everything You Cherish and Love?"  (*Id.*)  One of the clients, Joe Walker, notified Hudson that plaintiff sent him the book.  (*Id.*).  Hudson then reached out to Zember, who contacted

Judy Sanchez of human resources at Verint, who then started an investigation on February 2, 2022. (*Id.*)

As part of the investigation, Walker and Hudson were interviewed by Sanchez on February 2 and 3, 2022, respectively, and plaintiff was interviewed by DeJong on February 8, 2022. (*Id.* at pp. 9–12.) On February 9, 2022, DeJong, Zember, and Casey discussed the pending investigation and determined that plaintiff would be terminated "for conduct unbecoming of a Verint employee." (*Id.* at p. 12.) On February 10, 2022, Zember and DeJong met with plaintiff to notify him that he was terminated. (*Id.*)

With respect to who made the ultimate decision to fire plaintiff, Zember testified that DeJong was the decisionmaker. (ECF No. 58–3 p. 210, 100:4–14.) Plaintiff, however, did not know who was involved in the investigation or who made the decision to terminate him. (Def. SOMF ¶¶ 76, 77; Pl. Counter SOMF ¶¶ 76, 77.) And plaintiff does not dispute Defendants' claim that George and Zember did not have the authority to fire plaintiff. (Def. SOMF ¶¶ 69, 70; Pl. Counter SOMF ¶¶ 69, 70.)

Plaintiff claims that the real reason he was terminated was because he "blew the whistle" on three separate occasions. (*See* Pl. Counter SOMF ¶ 12.) The first event (Citibank Deal) started around March 2019 when plaintiff began working on the sale of a product to Citibank. (Def. SOMF ¶ 13; Pl. Counter SOMF ¶ 13.) Wilkie managed the Citibank account for Verint. (Def. SOMF ¶ 13; Pl. Counter SOMF ¶ 13.) At first, plaintiff agreed that Wilkie would share commission credit with him for the deal by proposing that this deal be removed from the "exceptions list." [2] (Def. SOMF ¶ 14.) However, plaintiff later

---

[2] Zember testified that the "exceptions list" is a list of accounts that were "enumerated" when Verint acquired Kiran, and that for the purposes of compensation sales reps who were responsible for those accounts would not be paid a commission for sales on those accounts. (ECF No. 58–3 p. 208, 51:20–52:1.)

changed his mind after Wilkie failed to meaningfully participate in the deal. (Def. SOMF ¶ 15; Pl. Counter SOMF ¶ 15.) Plaintiff believed that Wilkie fraudulently attempted to collect commission on a deal he was supposed to substantively contribute to, but failed to do so. (Def. SOMF ¶ 16; Pl. Counter SOMF ¶ 16.) Plaintiff testified that Jim DeLapa, a senior manager at Verint, told him that Wilkie had inaccurately entered entries on the Citibank Deal. (ECF No. 58–3 p. 87, 155:15–156:16.) Plaintiff claims that Zember told him "[w]hat does it matter to you if Tim [Wilkie] gets compensated?" (Pl. Counter SOMF ¶ 16.)

The second event (Expense Report) began around August 17, 2021 when plaintiff requested permission from his direct supervisor, Ramsey, for business travel to Pittsburgh to meet with a client. (Def. SOMF ¶ 23; Pl. Counter SOMF ¶ 23.) Rather than fly, plaintiff decided to drive to Pittsburgh, have dinner with the prospective client, and drive back. (Def. SOMF ¶¶ 24–26; Pl. Counter SOMF ¶¶ 24–26.) Plaintiff claims that Ramsey told him to falsify an expense report of his business trip to Pittsburgh and that Ramsey would sign the report. (Def. SOMF ¶ 27; Pl. Counter SOMF ¶ 27.) Plaintiff reported this to Hudson. (Def. SOMF ¶ 30; Pl. Counter SOMF ¶ 30.) Plaintiff did not face any retaliatory action for reporting the Expense Report incident to Hudson. (Def. SOMF ¶¶ 29–33; Pl. Counter SOMF ¶¶ 29–33.)

The third event (Huntington Bank Deal) commenced around July 1, 2021 when plaintiff began working on a deal to sell a product to Huntington Bank. (Def. SOMF ¶ 34; Pl. Counter SOMF ¶ 34.) As the deal with Huntington Bank was nearing completion, plaintiff claimed that Verint attempted to "tuck in" a series of different products known as XM into the deal at no cost to Huntington Bank. (Def. SOMF ¶ 35; Pl. Counter SOMF ¶ 35.) Plaintiff claims that he refused to secretly "tuck in" the XM product. (Pl. Counter SOMF ¶ 36.) Thereafter, plaintiff presented two deals to Huntington Bank, one with XM and

4

one without, and Huntington Bank ultimately accepted the deal without XM. (Def. SOMF ¶¶ 45, 46; Pl. Counter SOMF ¶¶ 45, 46.)

Throughout the investigation that led to his firing, plaintiff did not raise any of the three alleged whistleblowing events to human resources. (Def. SOMF ¶ 75; Pl. Counter SOMF ¶ 75.) Defendant DeJong also testified that he did not know about the three events before terminating plaintiff. (Def. SOMF ¶ 74; Pl. Counter SOMF ¶ 74.)

### III. PROCEDURAL HISTORY

This case was originally brought in the Superior Court of New Jersey, Ocean County. (*See* Compl.) Plaintiff asserts the following claims against Defendants: count one, a violation of the New Jersey Conscientious Employee Protection Act (CEPA), N.J.S.A. § 34:19–1, *et seq.*; and count two, a violation of the New Jersey Wage Payment Law (Wage Law), N.J.S.A. § 34:11–4.1, *et seq.* (*Id.* at pp. 20–23.) Defendants removed this case to the District of New Jersey based on diversity jurisdiction. (*Id.* at ¶ 7.) Although Wilkie and plaintiff are both New Jersey citizens, Defendants claimed that Wilkie was fraudulently joined to defeat diversity jurisdiction.[3] (*Id.* at ¶ 7(h).) Plaintiff filed a motion to remand and for sanctions (ECF No. 6), which Defendants opposed (ECF No. 9). Former Chief District Judge Freda L. Wolfson (ECF No. 13) found that Wilkie was fraudulently joined and, thus, denied the motion.[4] (ECF No. 12 pp. 9–13.)

---

[3] A removing defendant removing an action based on diversity jurisdiction can avoid remand to state court by showing that a defendant domiciled in the same state as the plaintiff was fraudulently joined to defeat diversity jurisdiction. *Ware v. CIBA Specialty Chems. Corp.*, 04–1645, 2004 WL 1743938, at *2 (D.N.J. Aug. 4, 2004).

[4] Notwithstanding Judge Wolfson's decision, the claims against Wilkie were not formally dismissed in the accompanying order (ECF No. 13). I will, accordingly, dismiss the claims against Wilkie. *See Atlas Data Privacy Corp. v. Blackbaud, Inc.*,

5

## IV.   STANDARD

### A.   <u>Motion for Summary Judgment</u>

A moving party is entitled to summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. (Rule) 56(a). A fact in dispute is material when it "might affect the outcome of the suit under the governing law" and is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude granting a motion for summary judgment. *Id.* "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255). A court's role in deciding a motion for summary judgment is not to evaluate the evidence and decide the truth of the matter but rather "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

A party moving for summary judgment has the initial burden of showing the basis for its motion and must demonstrate that there is an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After the moving party adequately supports its motion, the burden shifts to the nonmoving party to "go beyond the pleadings and by [their] own affidavits, or by the [] depositions, answers to interrogatories, and admissions on file,[] designate [] specific facts showing that there is a genuine issue for

---

757 F.Supp.3d 605, 618 (D.N.J. 2024) (dismissing defendant MyHeritage (USA) after it established that it was fraudulently joined).

trial." *Id.* at 324. To withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict the moving party. *Anderson*, 477 U.S. at 250. "[I]f the non-movant's evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment." *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249–50).

Ultimately, there is "no genuine issue as to any material fact" if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322. "If reasonable minds could differ as to the import of the evidence," however, summary judgment is not appropriate. *See Anderson*, 477 U.S. at 250–51.

V. DISCUSSION

 A. CEPA

CEPA permits a whistleblowing employee to bring a suit against an employer that retaliated against the whistleblowing employee through an adverse employment action. *Winters v. N. Hudson Reg'l Fire & Rescue*, 212 N.J. 67, 89 (2012). When analyzing CEPA claims, courts apply the burden–shifting framework in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Id.* at 90. First, the employee carries the burden of establishing a *prima facie* case of retaliation. *Id.* The burden "then shifts to the employer to 'articulate some legitimate, nondiscriminatory reason' for the adverse employment action." *Id.* (quoting *McDonnell Douglas Corp.*, 411 U.S. at 802). Next, the employee must establish that the employer's reason was a pretext and that retaliation was the true reason. *Id.*

To establish a *prima facie* case under CEPA, a plaintiff must show that: (1) he reasonably believed that his employer's conduct was violating a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy;

(2) he performed a "whistleblowing" activity; (3) an adverse employment action was taken against him; and (4) a causal connection exists between the whistleblowing activity and the adverse employment action. *Brown v. City of Long Branch*, 380 F. App'x 235, 239 (3d Cir. 2010).

"A CEPA plaintiff can prove causation by presenting either direct evidence of retaliation or circumstantial evidence that justifies an inference of retaliation." *Id.* (quoting *Zaffuto v. Wal–Mart Stores, Inc.*, 130 Fed. Appx. 566, 569 (3d Cir. 2005)). "Third Circuit courts have found a three[–]month or longer gap between the alleged whistle-blowing conduct and the adverse employment action insufficient to raise an inference of causation." *Verdone v. Rice and Rice, P.C.*, 724 F.Supp.3d 366, 388 (D.N.J. 2024) (citing to cases in support). "But because temporal proximity is only one factor courts consider for causation, courts have refused to dismiss CEPA claims for lack of causation even when there have been three[–]month or longer gaps if other evidence raises an inference of causation." *Id.* at 389 (citing to cases in support).

The question here is whether there is sufficient evidence in the record demonstrating that a genuine dispute of material fact exists as to whether there is a causal connection between the whistleblowing activities relating to the Citibank Deal, Expense Report, and Huntington Bank Deal and plaintiff's termination.[5] With respect to Ramsey, Hudson, George, and Zember, a causal link cannot exist as to any of them because they did not make the decision to fire plaintiff. *See Vatner v. Bd. of Trustees of the Univ. of Med.*, 12–3339, 2015 WL 461901, at *15 (D.N.J. February 4, 2015) (finding that the plaintiff could

---

[5] Defendants argue that plaintiff did not blow the whistle under CEPA. (Mov. Br. pp.18, 19, 25.) For the purposes of this section, I will assume that plaintiff performed "whistleblowing" activities as to the three events. I note that it is unclear when plaintiff allegedly blew the whistle on each occasion. Nevertheless, I will assume that plaintiff blew the whistle around the time each event approximately began.

not prove causation and defeat a properly supported summary judgment motion because the plaintiff, who bears the burden of proof, failed to articulate "which particular decision maker was responsible for which particular alleged adverse employment action"). As to Ramsey, there is no evidence in the record showing that Ramsey participated in the investigation, let alone decide to terminate plaintiff.[6] Similarly, as to Hudson, the extent of her participation with the investigation was an interview with human resources and a written statement after the interview. (ECF No. 58–3 p. 275, 184:21–185:12.) Hudson testified that she did not participate in the decision to terminate plaintiff and there is nothing in the record disputing this. (*See id.* p. 277, 192:10–12.) With respect to George and Zember, plaintiff admitted in his counter statement of material facts that they did not have the authority to terminate plaintiff. (Def. SOMF ¶¶ 69, 70; Pl. Counter SOMF ¶¶ 69, 70.) Plaintiff also testified that he did not know who was involved in the decision to fire him. (ECF No. 58–3 p. 147, 390:4–7.) The Internal Investigation document notes that George and Zember discussed plaintiff's interview with DeJong the day before plaintiff was terminated, and during this meeting a decision was made to fire him. (ECF No. 59–9 p. 12.) The document also explains that Zember and DeJong met with plaintiff to tell him he was fired. (*Id.*) However, that was the extent of Zember and George's involvement. The record shows that it was DeJong's decision to terminate plaintiff, and of the defendants, only he had the authority to do so. (*See* ECF No. 58–3 p. 210, 100:4–14.)

Concerning DeJong, he had no knowledge of the three alleged whistleblowing events before deciding to fire plaintiff. *See Dominguez v. Costco Wholesale Corp.*, 356 Fed.Appx. 611, 614–15 (3d Cir. 2009) (affirming

---

[6] (*See* ECF No. 58–3 p. 261, 84:22–24) (in response to a question asking if Ramsey knew about plaintiff's termination, Ramsey said: "I do not. I was not involved at all. I don't know when, or where, or how. I heard about it after the fact").

9

the District Court's decision to grant summary judgment against the plaintiff on the CEPA claim for failure to prove causation because there was no evidence in the record showing that the decisionmakers who fired the plaintiff knew about the alleged whistleblower activity prior to their decision); *Damiano v. CMG Mortgage Inc.*, 22–04783, 2024 WL 2746086, at \*9 (D.N.J. May 28, 2024) (finding that the plaintiff did not prove causation because the decisionmakers did not know about the alleged whistleblowing activity prior to the plaintiff's termination). Moreover, plaintiff knew he was under investigation, and yet, did not raise any of the alleged three whistleblowing events during his interview with DeJong on February 8, 2022—the day before he was fired—or during his meeting with DeJong and Zember on February 9, 2022—the day he was fired—despite having the opportunity to do so.

Also, the Citibank Deal started around March 2019, the Expense Report event began around August 2019, and the Huntington Bank Deal around July 2021. The gap in time between each event and plaintiff's termination on February 2022 is around 11, 7, and 6 months, respectively. *See Verdone*, 724 F.Supp.3d at 388; *Choy Comcast Cable Commc'ns, Inc.*, 08–4092, 2012 WL 253382, at \*10 (D.N.J. January 26, 2012) (finding that an inference of causation was not raised because there was a three–month gap between the alleged whistleblowing activity and termination). Plaintiff has not established a *prima facie* case under CEPA.[7][8] *See Celotex*, 477 U.S. at 322.

---

[7] As to Verint, "CEPA liability may attach to the employer by way of respondeat superior for the actions of its employees, and to individuals who perform retaliatory acts with the authorization of their employers." *Tonkinson v. Byrd*, 17–06162, 2018 WL 1919829, at \*4 (D.N.J. April 24, 2018). Because plaintiff failed to establish CEPA liability against employees DeJong, Hudson, Zember, and George, liability does not attach to employer Verint.

[8] In his opposition brief, plaintiff asserts pretextual arguments—the third step in the *McDonnell Douglas* test—to support his argument that he can sufficiently show causation. (Opp'n. Br. 45–53.) However, because plaintiff cannot establish a *prima*

### B. <u>Wage Law</u>

Plaintiff alleges that Defendants violated the Wage Law by failing to pay "all of the commissions and nondiscretionary bonuses contractually due to him." (Compl. ¶ 106.) The Wage Law defines "wages" as:

> [] the direct monetary compensation for labor or services rendered by an employee, where the amount is determined on a time, task, piece, or commission basis excluding any form of supplementary incentives and bonuses which are calculated independently of regular wages and paid in addition thereto.

N.J.S.A. § 34:11–4.1(c).

Defendants note that plaintiff testified that he obtained all wages owed to him while employed at Verint. (Mov. Br. p. 38.) Plaintiff's testimony confirms this to be the case and plaintiff does not counter this fact. Plaintiff was asked "are there any other wages or commissions that you believe that you were owed and have not been paid?" (ECF No. 58–3 p. 156, 425:5–7.) Plaintiff responded "[n]ot that I'm aware of, no." (*Id.*, 425:8.) Plaintiff testified that Verint should "pay [] [him] for the dinner" (*id.*, 425:2–3) but it is unclear which dinner plaintiff is referring to, and he did not assert any arguments in his brief demonstrating that any costs associated with this dinner is "wages" under the Wage Law.

Summary judgment will be granted in favor of Defendants on the Wage Law claim. *See also Noramco LLC v. Dishman USA, Inc.*, 21–1696, 2022 WL 2817876, at *5 (D. Del. July 19, 2022) (finding that the defendant's failure to respond to the plaintiff's arguments in the defendant's brief "constitutes a

---

*facie* case, the burden does not shift to Defendants under the second step in the *McDonnell Douglas* burden shifting test.

11

concession that there is no dispute of material fact with respect to those defenses").

### C. Rule 11 Sanctions

Defendants seek sanctions for attorneys' fees and costs under Rule 11. (Mov. Br. p. 42.) Defendants claim that plaintiff's claims are "wholly frivolous and lack any foundation." (*Id.*) Rule 11(b) imposes on any party who presents "a pleading, motion, or other paper … an affirmative duty to conduct a reasonable inquiry into the facts and the law before filing, and that the applicable standard is one of reasonableness under the circumstances." *Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533, 551 (1991). "[R]easonableness [under the circumstances is] defined as an 'objective knowledge or belief at the time of the filing of a challenged paper' that the claim was well[–]grounded in law and fact." *Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 289 (3d Cir. 1991) (quoting *Jones v. Pittsburgh Nat'l. Corp.*, 899 F.2d 1350, 1359 (3d Cir. 1990)). Thus, attorneys are required to conduct a "normally competent level of legal research to support the presentation." *Simmerman v. Corino*, 27 F.3d 58, 62 (3d Cir. 1994). However, "Rule 11 is intended to impose sanctions only in the exceptional circumstance, where a claim or motion is patently unmeritorious or frivolous." *Ballard v. AT&T Mobility, Inc.*, 15–8808, 2018 WL 3377713, at *4 (D.N.J. July 11, 2018).

If Rule 11(b) is violated, Rule 11(c) permits a court to impose sanctions, including reasonable attorneys' fees, expenses, or nonmonetary directives. Any sanction "must be limited to what suffices to deter repetition of the [sanctionable] conduct[.]" Rule 11(c)(4). Moreover, the decision whether to impose sanctions under Rule 11 is discretionary rather than mandatory. *Grider v. Keystone Health Plan Cent., Inc.*, 580 F.3d 119, 146 n.28 (3d Cir. 2009). In deciding a Rule 11 motion, "[a]ny doubt…should be resolved in favor of the party charged with the violation." *Sanders v. Hale Fire Pump Co.*, 87–2468,

1988 WL 58966, at *1 (E.D. Pa. June 1, 1988) (citing *Eavenson, Auchmuty & Greenwald v. Holtzman*, 775 F.2d 535, 544 (3d Cir. 1985)).

Here, I decline to impose sanctions on plaintiff, even though plaintiff failed to address Defendants' request for sanctions. I conclude this case does not present "exceptional circumstances" to warrant imposition of sanctions *See Ballard*, 2018 WL 3377713, at *4.

## VI. CONCLUSION

Summary judgment is granted in favor of Defendants. An appropriate order will accompany this opinion.

*/s/ Edward S. Kiel*
**EDWARD S. KIEL**
**UNITED STATES DISTRICT JUDGE**

Date: July 2, 2025